NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

————————————————

JAMES TYREE (PATRICIA A. TYREE, GUARDIAN AD LITEM),
*Petitioner*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent,*

BANNER HEALTH SYSTEM, *Respondent Employer*,

BANNER HEALTH, *Respondent Carrier*.

No. 1 CA-IC 24-0051
FILED 5-22-2025

————————————————

Special Action - Industrial Commission
ICA Claim No. 20210480120
Carrier Claim No. 88124
The Honorable Robert E. Trop, Administrative Law Judge

**AWARD AND DECISION UPON REVIEW AFFIRMED**

————————————————

COUNSEL

James Tyree, New Hartford, NY
*Petitioner*

Industrial Commission of Arizona, Phoenix, AZ
By Afshan Peimani
*Counsel for Respondent*

Ruegsegger Simons & Stern, LLC, Denver, CO
By Vito A. Racanelli
*Counsel for Respondent Employer and Carrier*

---

## MEMORANDUM DECISION

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe and Judge Andrew M. Jacobs joined.

---

**B A I L E Y**, Judge:

**¶1**         The Industrial Commission of Arizona ("ICA") has been adjudicating a series of issues related to Petitioner James Tyree's claim for benefits from an October 2020 industrial injury.  In this case, he appeals an award and decision upon review finding he is not entitled to permanent disability benefits because the injury did not cause him to lose earning capacity.[1]  Because he failed to make a prima facie case, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**         Tyree, a physical therapist who worked for Banner, was injured when he received a mandatory flu shot that gave him a rare condition called Guillain-Barre Syndrome ("Guillain-Barre").  Guillain-Barre (also known as acute inflammatory demyelinating polyneuropathy) is an acute condition in which antibodies attack the myelin sheath of nerves. It normally runs its course within a year.  Guillain-Barre can cause serious breathing problems mandating use of a respirator, which happened to Tyree in late 2020, leading to a short hospitalization.

**¶3**         Tyree received temporary benefits and active medical treatment until his claim was closed in October 2022.  In December 2022, the ICA issued an Award for Unscheduled Permanent Partial Disability finding Tyree had a 100% general physical functional disability and had sustained a 100% loss of earning capacity ("LEC").

**¶4**         Banner, a self-insured employer, protested the award, arguing Tyree had lost no earning capacity or, if he did, had not lost all

---

[1] The award also determined the amount of a credit to Respondent Banner Health System ("Banner") for an independent medical examination ("IME") appointment Tyree failed to attend.  Because Tyree makes no arguments related to that ruling, we do not address it.  *See generally Meiners v. Indus. Comm'n*, 213 Ariz. 536, 538, ¶ 8 n.2 (App. 2006).

earning capacity. Banner submitted a labor market expert written report that concluded Tyree had no LEC caused by the industrial injury.

¶5             An ICA Administrative Law Judge ("ALJ") conducted a hearing to determine whether Tyree's work injury had caused him to lose earning capacity. Banner called no witnesses. Tyree called three witnesses: himself and two medical experts, a neurologist and an internist, who had performed an IME of him in January 2023. The IME included physical examinations, for which Tyree appeared in a wheelchair, insisting he "had to go everywhere in [it]." The neurologist, Dr. Leo Kahn, concluded that Tyree was not giving his best efforts at the examination. In addition, based on surveillance video of Tyree independently getting in and out of a car, walking outside to place trash in a bin, and engaging in other activities, Dr. Kahn concluded Tyree had "a much greater functional capability when observed outside of a medical setting than when formally examined."

¶6             Dr. John Schaller, a board-certified internist, testified that when he examined Tyree for the IME in January 2023, Tyree had no ongoing issues or residual effects caused by Guillain-Barre. He concluded Tyree was malingering at the exam and had not been truthful about his functional abilities. Both IME doctors agreed Tyree has no work restrictions attributable to Guillain-Barre. Indeed, Tyree testified that none of his treating doctors have given him work restrictions.

¶7             Tyree represented himself at the hearing. He spent much of his testimony explaining he has CIDP (chronic inflammatory demyelinating polyneuropathy) resulting from Guillain-Barre and attempting to discredit the surveillance video. He testified that many of his treating physicians were treating him for CIDP, but he did not call any of them to testify his CIDP diagnosis was causally related to the work injury. Both testifying medical experts denied Tyree had CIDP or that evidence in the medical records supported such a finding. Dr. Kahn testified it was extremely unusual for someone to develop CIDP following Guillain-Barre and that Tyree's electrodiagnostic studies results were inconsistent with that diagnosis.

¶8             As to the video, Tyree introduced a report authored by a "digital forensic examiner." That report concluded the surveillance video was "compilations composed of segments combined from 2 or more other videos." Tyree testified the video was cobbled together and that sometimes it showed a person who was him and other times it showed someone who was not him. He repeatedly sought to exclude the video, to no avail.

¶9 In the weeks before Dr. Schaller, the final witness, was scheduled to testify, Tyree filed numerous motions seeking to: (1) exclude Dr. Kahn's IME addendum based on his review of the surveillance video; (2) hold Dr. Kahn in contempt; (3) recall Dr. Kahn for testimony; (4) remove the ALJ for cause; and (5) postpone Dr. Schaller's testimony until Tyree could obtain a transcript of Dr. Kahn's testimony, who had testified only a week before the motion to postpone. The ALJ denied every motion.

¶10 Two days before Dr. Schaller's scheduled testimony, an unsigned, typewritten letter entitled "To whom it made [sic] concern" was filed stating Tyree had been placed under a guardianship in Pinal County. The letter further stated, "[Tyree] has been determined to be incapable of handling his own legal matters," and the ICA hearing process "broke [Tyree's] ability to participate in this hearing." The letter concluded by stating that Tyree "is now legally removed from any further participation" in the case.

¶11 Early on the day scheduled for Dr. Schaller to testify, someone filed with the ICA another unsigned document from an unidentified person written in the style and formatting of Tyree's prior filings. The document stated that Tyree was under temporary guardianship and none of his family or friends would take part in the ICA hearing process. The letter proposed two outcomes: (1) "drop the hearing" and allow the claim to move forward under the 100% LEC first found by the ICA; or (2) have a probate court representative "assume the representation" of Tyree. The letter provided copies of Pinal County Superior Court documents finding Tyree incapacitated and ordering a temporary guardianship effective several days before Dr. Schaller's scheduled testimony.[2] The ICA appointed Tyree's mother as guardian ad litem under Arizona Revised Statutes ("A.R.S.") section 23-1066.

¶12 Tyree did not appear at the time set for Dr. Schaller's testimony. The ALJ called Tyree's contact number and, getting no response, left a message. Banner's counsel stated that Tyree had filed a document with the ICA just a few days before mentioning a guardianship. The ALJ noted there was "nothing filed in the [ICA] portal" and "nothing in the [ICA] portal regarding any alleged guardianship motion." The ALJ then took testimony from Dr. Schaller without Tyree present.

---

[2] Tyree signed and filed with the ICA a Petition for Rearrangement or Readjustment of Compensation the same day and continued to file other protests and hearing requests over the next several months.

**¶13**      The ALJ issued an award concluding Tyree failed to prove he lost earning capacity due to his work injury. The ALJ noted Tyree had not "established that [he] could not return to the date-of-injury employer, there was no good faith search for work, and there was no testimony from a labor market expert." The ALJ found Tyree was not a credible witness. He also concluded the surveillance video depicted Tyree and corroborated Drs. Kahn and Schaller's conclusions that Tyree was capable of more activity than he was claiming at the IME. In short, Tyree had failed to make a prima facie case.

**¶14**      In response, Tyree filed an almost sixty-page request for review alleging various errors that were either requests to re-weigh the evidence or claimed procedural errors. The ALJ reconsidered the record and summarily affirmed the award.

**¶15**      We have jurisdiction over this statutory special action under A.R.S. §§ 12-120.21(A)(2) and 23-951(A), and Arizona Rules of Procedure for Special Actions 21 through 26.

## DISCUSSION

**¶16**      When reviewing an ICA award, we defer to the ALJ's factual findings but review legal questions de novo. *Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14 (App. 2003). Viewing the evidence in the light most favorable to sustaining an award, we will affirm if the decision is reasonably supported by the evidence. *Lovitch v. Indus. Comm'n*, 202 Ariz. 102, 105, ¶ 16 (App. 2002). The ALJ is empowered to resolve all conflicts in the medical evidence, draw warranted inferences, and judge witness credibility. *See Carousel Snack Bar v. Indus. Comm'n*, 156 Ariz. 43, 46 (1988); *Malinski v. Indus. Comm'n*, 103 Ariz. 213, 217 (1968). An ALJ may reject testimony that is inherently inconsistent and contradictory, or when inferences can be drawn from other evidence that cast doubt upon the credibility of such testimony. *Wimmer v. Indus. Comm'n*, 15 Ariz. App. 543, 544 (1971).

**¶17**      The injured employee bears the burden of establishing each element of a claim. *Yates v. Indus. Comm'n*, 116 Ariz. 125, 127 (App. 1977). Generally, when an injury would not be apparent to a layperson, expert medical testimony must establish a causal connection between the accident and the employee's medical condition. *Gutierrez v. Indus. Comm'n*, 226 Ariz. 1, 3, ¶ 5 (App. 2010), *aff'd in part*, 226 Ariz. 395 (2011). To prevail on appeal, Tyree must show no reasonable basis exists for the ALJ's findings and the

ALJ's credibility determinations were wholly unreasonable. He has not done this.

¶18 Once a permanent impairment is established, the ICA must make an initial determination whether the injury has caused LEC. *See* A.R.S. § 23-1047(A)-(B). If this determination is protested, the ICA's initial determination becomes a nullity and is of no evidentiary value. *Le Duc v. Indus. Comm'n*, 116 Ariz. 95, 98 (App. 1977). The burden of proving LEC is on a claimant, who must show an inability to return to the same work they were doing on the date of injury. *Landon v. Indus. Comm'n*, 240 Ariz. 21, 26-27, ¶ 18 (App. 2016). Once a claimant demonstrates that inability, the claimant must then show that a good-faith effort was made to obtain other suitable work or present testimony from a labor market expert establishing the claimant's earning capacity. *Id.* Having done that, the claimant has made a prima facie case, and the employer must then go forward with evidence showing the availability of suitable employment or a lack of causal relationship between any LEC and the injury. *Id.* at 27, ¶ 18.

¶19 When determining LEC, "consideration shall be given, among other things, to any previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform after the injury, any wages received for work performed after the injury and the age of the employee at the time of injury." A.R.S. § 23-1044(D). Medical expert testimony is relevant to the causal relationship between an injury and the resulting disability. *Adkins v. Indus. Comm'n*, 95 Ariz. 239, 243 (1964). But medical experts cannot opine about whether a claimant is able to carry out the skills of a particular job. *Id.* For that, a party must present a labor market expert. *See Tucson Steel Div. v. Indus. Comm'n*, 154 Ariz. 550, 556 (App. 1987) (holding that a medical report provided medical input that enabled the labor market expert to match more recent physical tolerances from a medical condition with the requirements of specific jobs in the open labor market, a match that constituted "suitability," one of the elements of earning capacity). These experts assist the ALJ in properly considering the statutory factors and determining how the impairment affects earning capacity.

¶20 We agree with the ALJ that Tyree failed to show the prima facie elements of a claim for LEC. He offered no testimony about his efforts after the closure of his claim to return to the same work he had been doing at the time of his injury, either with or without accommodations. The record contains medical records describing work restrictions for Tyree after closure of the claim, but these descriptions do not causally relate the

restrictions to the work injury. Without further foundation and explanation from an expert, and in the face of contrary testimony from two expert witnesses, these documents cannot support a conclusion that Tyree could not work due to his work injury. A claimant must show that any LEC results from the industrial injury and not some other condition. *See Payton v. Indus. Comm'n*, 27 Ariz. App. 92, 95 (1976) ("The difficulty with this contention is that there is no evidence which would support a finding that any part of petitioner's post-July 8, 1973 disability was actually caused by the prior industrial injury."). And Tyree offered no testimony about good-faith efforts to return to some type of work upon closure of his claim. Without that evidence, or a labor market expert to testify to his earning capacity, his case fails as a matter of law.

¶21　　　　Because the record shows Tyree failed to make a prima facie case that he has an LEC, we need not address his many claimed errors on appeal. Arizona Revised Statutes § 23-941(F) exempts ICA hearings from formal rules of evidence or procedure, requiring only that the hearing process achieve "substantial justice." We have reviewed the record and see no denial of substantial justice. Although Tyree alleges procedural errors in the ICA proceedings, he raises no issue on appeal about the testimony of Dr. Schaller proceeding in his absence. The ALJ also limited use of the video surveillance footage, for which Tyree spends much energy in an impeachment attempt, to corroborate the IME doctors' conclusions that Tyree was capable of more effort than he showed during the exam, a conclusion they had reached independently from the video. We will not reweigh the evidence. *Wal-Mart v. Indus. Comm'n*, 183 Ariz. 145, 146–47 (App. 1995). The award is supported by evidence in the record.

## CONCLUSION

¶22　　　　We affirm the award and decision upon review.



MATTHEW J. MARTIN • Clerk of the Court

**FILED**:　　JT